OXFORD UNIVERSITY PRESS, N. Y., INC., (M. FARRIS & Co., INC.) *v.* UNITED STATES (No. 4607) [1]

[1] C. A. D. 405.

United States Court of Customs and Patent Appeals, March 1, 1949

*Lane, Young & Fox* (*James W. Bevans* and *William H. Fox* of counsel) for appellant.

*David N. Edelstein,* Assistant Attorney General (*Joseph F. Donohue,* special attorney, of counsel), for the United States.

[Oral argument February 2, 1949, by Mr. Bevans and Mr. Donohue]

Before GARRETT, Chief Judge, and HATFIELD, JACKSON, O'CONNELL, and JOHNSON, Associate Judges

JACKSON, Judge, delivered the opinion of the court:

Appellant imported from England certain unbound books in sheets which were invoiced as "5000 Oxford Dictionary of Quotations. Folded and collated." The importation was invoiced and entered at the value of 6 shillings sterling per copy, based upon the cost of production plus charges for packing and marking. The sheets were appraised by the appraiser of merchandise at the port of New York at a value of 8 shillings 9 pence per unit plus packing and marking charges.

From that appraisement, appellant appealed for a reappraisement by a judge of the United States Customs Court, who in his decision held the dutiable value of the merchandise to be that reported by the appraiser. An appeal was taken from that decision to the Third Division of the court, which affirmed the finding of the reappraising judge. From the judgment of the division, this appeal was taken.

It was agreed by counsel for the parties that cost of production is the proper basis for appraisement, and that there is no foreign, export, or United States value for the goods.

At the trial of the case, appellant introduced three exhibits, two of which were depositions taken in London, England, of the manager of the Oxford University Press, the exporter herein. In the first of those exhibits, it appears that the Oxford University Press sold to appellant 5000 copies of the aforesaid merchandise. It appears that the units, after importation, are bound in book form in this country. In that exhibit the cost of materials, fabrication, manipulation, and other

means employed in the manufacture of the goods was a fraction over 6 shillings 2 pence per unit.

Upon request of the Vice Consul of the United States at London, the manager for the exporter furnished cost of production figures, itemized in the manner and form requested by the American consulate. Those figures consist of a list of items entering into the cost of plates from which the sheets were printed. The cost per unit of composition, editorial costs, correction, and proof-reading, and plates amounted to the sum of 1 shilling, and the cost of material and printing 2 shillings 7¼ pence. Appellants third exhibit is a copy of a report of an investigation by the American Embassy at London in response to a request to the State Department by the Treasury Department requesting information in regard to the cost of production of the involved merchandise.

That report sets out the following:

The current costs (i. e. printing and paper) are based on an edition of 20,000 copies printed at one time. The non-recurring costs (i. e. composition, editorial, correction and proof-reading, plates, translations, indexing, permission fees and royalties) are spread over 65,000 copies, of which 47,320 copies have already been printed. This is, I believe, the usual course followed by publishers when dealing with the costs of reference books likely to be in demand for many years.

The charge for folding and collating was the actual charge for the 10,000 copies shipped to New York.

It may be noted that in arriving at the cost of production of the merchandise, the exporter based the current costs on an edition of 20,000 copies and the non-recurring costs on 65,000 copies.

The issue here is whether or not the entire non-recurring costs should be included with the current costs on 20,000 copies, rather than as set out in the quoted portion of appellant's third exhibit.

It is the position of counsel for appellant that the non-recurring costs of the plates, which are all costs prior to the actual finishing thereof, including composition, editorial work, correction, proof-reading, indexing, permission fees, etc., should be spread over 65,000 copies of the book, which, as stated in their brief, were to be printed from the finished plates in the ordinary course of business. Counsel for appellee challenged that contention and thus the issue arose.

Section 402 (f), Tariff Act of 1930, which is concededly the statutory basis for the appraisement reads as follows:

(f) ˙COST OF PRODUCTION.—For the purpose of this title the cost of production of imported merchandise shall be the sum of—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business.

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3) The cost of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

If the facts in this case revealed that 65,000 copies of the involved goods had been contracted for or that the Oxford University Press of London had in fact printed that number of the book in question prior to the date of exportation, a different situation would be before us.

There is nothing in the record from which it could even be implied that 65,000 copies of the dictionary were to be printed. It is true, as is shown from the quoted portion of appellant's exhibit, that 47,320 copies had been printed. But as far as the United States Appraiser of Merchandise, the tribunals of the United States Customs Court and this court are concerned, at the time of the exportation, 20,000 copies only had actually been produced.

This appears to be a case of first impression, and we do not find in any of the authorities cited by the parties a guide for decision. It is superfluous, therefore, to discuss those cases. No one, as far as the record is concerned, prior to the date of exportation, definitely knew the number of copies of the book which were to be printed. In the book publishing business, we think it is fair to assume that, as in any other business, the law of supply and demand is the measure of production. There is no evidence that there was any demand for 65,000 copies, and no basis upon which a court could determine the cost of production, except on the 20,000 copies that had been printed. It might very well have happened that the demand for the publication would not exceed 20,000 copies, and in such event the manufacturers and exporters would, as happens in many other manufacturing and selling industries, be left "holding the bag." Such things constantly occur in the business of manufacturing, buying and selling.

It may be noted that the value fixed by the appraiser and also found by the court exceeds the entered and claimed value by but a few pence over 2 shillings, and as far as this case is concerned, appellant's argument, that, if the judgment appealed from should be affirmed, the merchandise would be placed beyond the purchasing power of many who would desire to secure the book, falls.

It is quite natural, with respect to the payment of ad valorem duties, that it is to the interest of both the exporter and importer to

hold down such value so that the duties to be paid upon importation will be as low as possible. That is a perfectly legitimate and proper thing to do. Such tendency, however, might result, in cases of similar nature, in the alleged estimation or calculation of costs on 100,000 or 200,000 copies of the book, which the manufacturer knew could not be sold. In that event the non-recurrent costs would be so small as to be practically negligible, and the duty assessed against that calculation would not be a proper reflection of cost of production.

It is immaterial that the dutiable value of the present importation, resulting from the action of the appraiser, may result in a lower rate of duty for subsequent importations of the same merchandise. If such a situation should arise, it seems to us that appellant would be entirely "squared off" on the total over-all costs.

The analogy between the regulations of the Secretary of the Treasury with respect to the depreciation, capital gains, losses and the like with respect to other taxes, appearing in the brief of appellant, we do not think has any pertinence with respect to tariff laws and regulations.

For the reasons hereinbefore stated, the judgment of the United States Customs Court is *affirmed*.